NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| In re: | : | Bankruptcy Case No. 09-17079 |
| | : | |
| MATTHEW D. MOFFITT | : | Chapter 13 |
| | : | |
| Debtor. | : | **MEMORANDUM OPINION** |
| | : | Motion to Deny Confirmation |
| | : | Document Number 15 |
| | : | Hearing Date: December 3, 2009 |

_____:

## APPEARANCES

<u>ATTORNEY FOR DEBTOR</u>

Joseph M. Casello, Esquire
COLLINS, VELLA & CASELLO
1451 Highway 34 South
Suite 303
Farmingdale, New Jersey 07727

<u>PRO SE</u>

Ralph D. Tawil, Esquire
1062 Broadway
West Long Branch, New Jersey 07764

Ralph Tawil, an unsecured creditor of the Chapter 13 estate of Matthew Moffitt, filed an objection to confirmation of Mr. Moffitt's proposed plan. He also filed a motion to deny confirmation. Both documents were based on the same essential point: that Mr. Moffitt's proposed plan did not include all disposable income in violation of 11 U.S.C. § 1325(b)(2). The facts upon which that allegation is based are that Mr. Moffitt undervalued the property located at 19 Water Street, Englishtown, NJ, did not include rental income from an apartment located at that address, and deliberately minimized his reported income from I2 Solutions, Inc.

Mr. Moffitt responded by retaining a rental agent and ultimately accepting a tenant for the Water Street apartment. He modified his plan to, among other things, include the new rental income.

The parties appear to agree on the legal standard. Section 1325(b)(1)(B) of the Bankruptcy Code requires that "the court may not approve the plan unless ... the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period ... will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B). In re Alvarado 2009 WL 3617655, 1 (Bankr. E.D.Tex.,2009). The Bankruptcy Code does not define the term "projected disposable income." Most courts to have considered the meaning outside the means test analysis of 1325(b)(3)[1], have held that "disposable income" means "current monthly income received by the debtor less, *inter alia,* amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." In re Urquhart 2009 WL 3785573, 2 (Bankr. C.D.Ill.,2009).

---

[1] Since neither Mr. Tawil nor any other objector has raised the median family income for the state under 1325(b)(3) as a bar to confirmation, the court will focus only on the requirements of 1325(b)(1) and (2). The objection does not mention the state median income, but rather focuses on unreported income, deliberately depressed income and inflated expenses.

2

**Property Valuation for 19 Water Street**

The first allegation is that Mr. Moffitt undervalued the Water Street property.  On this issue, the Debtor submitted his own testimony, a market evaluation by a local realtor dated May 5, 2009, and an appraisal dated October 3, 2006.   The Debtor testified that the property is worth approximately $210,000, the realtor $205,000, and the appraiser $275,000.   Mr. Tawil submitted the appraisal and testimony of Russell Thompson, valuing the property as of September 30, 2009 at $298,000.

The evidence offered by the Debtor in support of the value is somewhat weak.  The Debtor is competent to testify as to the value of his own property, although the weight of that testimony is undercut by the obvious interest he has in keeping the value low.  The market evaluation analysis is conducted by a realtor rather than an appraiser, and while that is also competent evidence as to value, it does not carry the weight of a valuation by a qualified appraiser.  The appraisal submitted by the Debtor, which would ordinarily carry the most weight, describes a value of the property as of a date three years ago.  The court can take judicial notice that the real estate market in the intervening years has been unusually unstable.

At the same time, the appraisal and testimony submitted by the objector is less than convincing. Mr. Thompson did not consider the sale of a two family home adjacent to the subject property because he believed the price was depressed because the property had been foreclosed. While it may be true that foreclosed property often sells for less than unforeclosed property, Mr. Thompson did not factor in that the property had been marketed for a long time at $209,000 and was ultimately sold for $100,000 cash by the foreclosing bank.  There are certainly problems with using a listing price as a comparable, and the $100,000 sales price was certainly not indicative of the

market without adjustment, but to completely ignore such a similar property in favor of alleged comparables in other municipalities undercuts the reliability of the appraisal analysis.

In addition, the appraiser's description of the property as in "average" condition is at odds with the testimony of both the Debtor and the realtor with personal knowledge of the property. Even if they are not expert appraisers, the owner and the reator are more than competent to describe the condition of the property. Reliance on the fact that the Township of Englishtown issued a Certificate of Occupancy to determine condition is curious to say the least, and Mr. Thompson's descriptions of his observations about the condition of the property were vague and over generalized. His statement that the property "is in need of care, true, but that is the owner's fault" [C-2 in evidence] attaches an improper judgment to the description of the property: the condition is what it is from a buyer's perspective, and should not be altered by the perceived cause of the condition.

Finally, Mr. Thompson's testimony that the value of this property had increased in value during the last three years and that it is somehow discriminatory to make adjustments based on location was...baffling.

Even taking into consideration the relative weights of the evidence presented, the unexplained anomalies in the Thomson appraisal lead to the conclusion that the Debtor has met his burden of establishing by a preponderance of the evidence that the value of the Water Street property is currently not more than $210,000. To the extent that the objection is based on undervaluation of the real estate, it will be overruled.

### Rental Income from 19 Water Street

The next allegation is that Mr. Moffitt deliberately rented the 2d apartment at 19 Water Street at a below market rate as part of an effort to minimize his income. Mr. Moffitt testified that the

apartment was vacant from August 2008 until September 2009.  He presented evidence that he had

advertised for tenants in the Asbury Park Press numerous times over that year, and testified that this

was consistent with how he had acquired tenants in the past.  When Mr. Tawil objected that he was

not renting the 2d apartment at all as part of the effort to minimize income, Mr. Moffitt hired a

realtor to obtain a tenant.  In the summer of 2009, Mr. Moffitt  listed the rental at $1275 per month.

When that failed to produce a tenant and with the advice of the realtor, he dropped the listed rental

price to $1200 per month, obtained a tenant and modified his plan to include that additional income.

In opposition to the evidence the Debtor presented on the market value of the rental, Mr.

Tawil presented Mr. Thompson's testimony that the upstairs unit should have been rented for

approximtely $200 per month more than it was.  The support for that allegation apparently came

from the rent charged by the comparables listed in the appraisal, which ranged from $2,500 per

month to $3,000 per month.   The rent charged by the Debtor totals $2,315 per month.   Mr.

Thompson also noted that such rental rates were consistent with his valuation, although it is not sure

which came first in his analysis.  Mr. Moffitt testified that even though he listed the income in his

schedules, the new tenant has given notice that she intends to terminate the lease in February due

to allegedly inhabitable conditions.  He also indicated that he is slowly trying to stockpile funds for

some major repairs that will be necessary in the near term.

Mr. Thompson's opinion as to the rental value is entitled to considerable weight.  However,

the most weighty evidence of all is the length of time that the apartment remained unrented despite

lengthy marketing efforts.  Mr. Thompson's opinion may differ from that of prospective renters due

to his belief that the property is in "average" condition.  The court has already concluded that Mr.

Thompson's assessment of the condition of the property is on the rosy side.  The court must

conclude that the market supports the current rental rates and the objection that Mr. Moffitt has deliberately rented one of the apartments for a below-market rate will be overruled.

### Income from I2 Solutions Inc.

The final basis alleged as objection to confirmation is that Mr. Moffitt controls his income from I2 Solutions Inc. ["I2"] and that he is manipulating his income and corporate expenses to minimize his disposable income available to creditors.  It is undisputable that Mr. Moffitt, as the sole shareholder, officer, director and employee of I2,  could easily engage in such manipulation, so this area deserves particular attention.  This is especially so since the accounting presented by Mr. Moffitt for his closely held corporation is far from straightforward.

Mr. Moffitt testified that I2 provides engineering support for services to the US Army, currently on a consulting basis through a company called Janus Research Group, Inc. ["Janus"]. While there is no prohibition of which he is aware against individuals bidding on such contracts, he formed the company for, among other reasons, to make it more attractive to those taking bids.  I2 was awarded the contract with Janus, which pays for hourly services up to a fixed amount plus another fixed amount for reimbursable travel.  Janus pays contract funds  to I2 based on invoices based on hourly services.  I2 then pays Mr. Moffitt a salary of approximately $130,000 per year and pays its own expenses, including taxes, insurance, telephone service, professional fees and the like. At the end of the year, if there are funds left over, Mr, Moffitt is entitled to any dividend that can be distributed.  Last year I2 distributed a $4,300 dividend to Mr. Moffitt.

Unfortunately, the accounting is not as simple as that description may make it sound.  Mr. Moffitt testified that he runs the I2 expenses through three accounts: one for travel expense, one for payroll and corporate taxes, and one for operating expenses such as salaries.  He explained that this

setup is consistent with his duty to maintain traceable funds for a defense contracts auditing agency. He also testified that he did not set up the three accounts at I2's inception or in the early stages of its work for Janus. As the testimony progressed, it became apparent that Mr. Moffitt was less than meticulous about his record keeping, at least in the early days of the company and contract. Eventually he seems to have settled in to a procedure whereby all funds are placed into a single account, then transferred to I2's other accounts on an as needed basis.

Mr. Moffitt's failure to adhere strictly to the accounting described makes it hard to assess the bona fides of I2's income and expenses by simply looking at the bank statements and other company records. His use of credit cards from older privately held companies, his short term loans from Janus, his renegotiation of the cap on travel reimbursement, the fact that he makes deposits sometimes in person, sometimes by phone, and sometimes electronically, all muddy the seemingly straightforward manner in which I2 records its financial transactions. Nonetheless, when pressed on cross examination, Mr. Moffitt was slowly but consistently able to trace funds from Janus through I2's operating account and into other accounts. The travel expenses are high, but it is important to recall that expense reimbursement is not income, it is reimbursement for funds paid out by Mr. Moffitt individually. The money he receives for expense reimbursement, which he is required to document for the US government, was properly not included in his schedules as income.

Mr. Moffitt included in his schedules all of the income he derived from I2 last year, including the $4,300 dividend. There was no indication in his testimony or in any of the evidence submitted that I2 was paying unreasonable expenses prior to making distribution of either salary or dividends to Mr. Moffitt. The $130,000 salary is consistent with what Mr. Moffitt earned in the past, with the business that I2 has done in the past and anticipates and with the books and records

7

submitted into evidence.  Mr. Tawil was unable to present evidence to overcome the preponderance

of evidence as submitted by Mr. Moffitt.  The objection that Mr. Moffitt has hidden income to lower

the disposable income available to creditors is overruled.

### Conclusion

The court has little doubt but that Mr. Tawil rendered substantial services to Mr. Moffitt in

the context of the matrimonial proceeding and that Mr. Tawil feels ill used by Mr. Moffitt's

bankruptcy.  The court also understands and sympathizes with the high degree of frustration that the

manner in which Mr. Moffitt accounts for his business, both as principal of I2 and as landlord of

the property at 19 Water Street, must have engendered.  When all the dust settles, however, it seems

apparent to this court that Mr. Moffitt has been reasonably forthcoming with his financial

information and is not attempting to do anything other than is his right under the Bankruptcy Code.

The matter may proceed to confirmation as scheduled on January 27, 2010 with the benefit of this

court's decision to overrule Mr. Tawil's objection.  Counsel to Mr. Moffitt shall submit a form of

order overruling Mr. Tawil's objections and denying the motion.


*/s/ Kathryn C. Ferguson*
KATHRYN C. FERGUSON
US Bankruptcy Judge

Dated: December 30, 2009